**Commonwealth v. Serge**

C.P. of Lackawanna County, no. 01-CR-260.

*Amy Shwed,* for plaintiff.
*Joseph D'Andrea,* for defendant.

NEALON, *J.,* September 14, 2001—The Common-wealth has filed a motion in limine which raises an issue of first impression in this Commonwealth: whether the prosecution may present a computer-generated anima-tion as demonstrative evidence to illustrate the expert opinions of its forensic pathologist and crime scene reconstructionist as to how a fatal shooting allegedly occurred. Assuming that the Commonwealth satisfies the requirements of Pa.R.E. 401 and 901 by properly au-thenticating its animated exhibit as a fair and accurate depiction of its experts' reconstruction of the relevant crime, the Commonwealth will be permitted to use the proffered animation at the time of trial provided that the final version of the videotape animation does not include any inflammatory features which may cause unfair preju-dice as proscribed by Pa.R.E. 403. Additionally, to en-sure that the computer-generated visualization does not unfairly prejudice the defendant, the court will provide a cautionary instruction to the jury during the trial and will require pretrial disclosure of the exhibit to the defense consistent with the reasoning set forth below.

## I. FACTUAL BACKGROUND

The Commonwealth has charged the defendant with first-degree murder and third-degree murder in connection with the shooting death of his wife, Jennifer Serge, on January 15, 2001. Although the defendant acknowledges killing his wife, he contends that he acted in self-defense as he was being attacked by her with a knife. Alternatively, in light of the fact that defendant's blood alcohol level was measured at .10 percent almost nine hours after the shooting, defendant maintains that he was too intoxicated to form the specific intent to kill which is required for first-degree murder or the degree of malice aforethought necessary for a third-degree murder conviction. (See transcript of preliminary hearing on 2/9/01, pp. 103-107.)

The Commonwealth intends to offer the testimony of a forensic pathologist, Gary W. Ross M.D., who performed the autopsy on Jennifer Serge. Dr. Ross has concluded that the decedent suffered two gunshot wounds, one from a bullet which entered her back and exited her abdominal region in a slightly downward direction, and another fatal wound from a bullet which originally passed through her right upper arm before penetrating her right chest cavity, piercing her lungs and heart and exiting the left side of her chest in a downward trajection. (*Id.,* pp. 46-53, 57-59.) Although Dr. Ross classified the manner of death as criminal homicide, he could not state with a reasonable degree of medical certainty at the time of the preliminary hearing which of the two bullets had entered the victim's body first. (*Id.,* pp. 45-46, 69-70.)

The Commonwealth will also offer the testimony of a firearm and toolmark examiner, Trooper Todd M.

Neumyer, who will opine that the residue from one gunshot reflects that the muzzle of the defendant's .44 Remington magnum was only 21 inches from the decedent at the time it was fired. (See Commonwealth's motion in limine, ¶10.) In addition, the Commonwealth intends to call a crime scene reconstruction expert, Trooper Brad R. Beach, who has prepared a series of diagrams based upon measurements and physical evidence collected at the scene of the crime. Specifically, Trooper Beach has drafted 14 scale diagrams depicting (1) the crime scene, (2) room dimensions, (3) body positions, (4) bullet impact dimensions portraying where the bullets struck certain objects in the room, (5) the dynamics of the three bullet paths, and (6) the dimensions of the distances between the shooter, victim and objects in the room, including diagrams depicting the "z-axis" or vertical measurements and dynamics. (See Trooper Beach report dated 8/14/01, pp. 3-18.) Furthermore, as a result of his subsequent conference with Trooper Beach during which time they reviewed the autopsy findings and crime scene data, Dr. Ross recently authored a supplemental report stating that:

"I am of the opinion to a reasonable degree of medical certainty that the first gunshot wound to inflict Jennifer Serge was sustained to her right back and listed in my autopsy report as gunshot wound no. 1. The second gunshot which she sustained to the right arm and chest is listed in my autopsy report as no. 2.

"It is also apparent after review of the crime scene photographs that both the body and specifically the right arm of Jennifer Serge had been moved sometime between her death and the time the photographs were taken be-

cause of the distribution pattern of blood on the clothing of the decedent." (See letter dated 8/16/01 from Dr. Gary W. Ross to Asst. District Attorney Amy Shwed.)

The Commonwealth has filed a "motion in limine: crime re-enactment" seeking leave of court to present "the video re-enactment of the murder of Jennifer Serge" by a demonstrative evidence company which "can accurately reconstruct the shooting of Jennifer Serge using the autopsy report, firearm report, crime scene photographs and crime scene measurements." (See Commonwealth's motion in limine, ¶13.) The Commonwealth submits that "[t]he video will evidence the fact that the defendant acted with specific intent to kill and malice" and "will negate any claim of self-defense put forth by the defendant." (See Commonwealth's brief in support, p. 3.) The defendant counters that the Commonwealth's motion in limine should be denied since (a) "the Commonwealth has not identified the actors who will portray the defendant and Jennifer Serge," (b) "the creator of the video will be producing what amounts to [be] his opinion of how the offense occurred" and (c) the proffered animation will "usurp the function of the jury as finder and interpreter of fact" by compelling the jurors to "accord greater weight to the video reconstruction without consideration of the weakness of the opinion or opinions upon which it is based." (See defendant's brief in opposition, pp. 1-4, 10.)

An evidentiary hearing was conducted on July 30, 2001, at which time the Commonwealth introduced the testimony of Andre Stuart of 21st Century Forensic Animations which has been retained to prepare the demonstrative reconstruction for the Commonwealth. Mr. Stuart

testified that his company does not produce computer-generated "re-enactments," but instead merely creates a "visual exhibit" or "animated exhibit" to be utilized during an expert witness' testimony. (See transcript of proceedings on 7/30/01, pp. 13, 20, 23, 39, 44-45, 72-73.) 21st Century provides a graphical presentation of another expert's opinion and does not present its own opinion or even furnish its interpretation of another expert's conclusions. (*Id.,* pp. 25-27, 36, 54-55, 59, 63-64, 72, 77.) Rather, based upon the dimensional data that is secured from the expert, the computer and its animation software package compile 30 images per second and 21st Century transforms those images into a videotape where they can be perceived as motion or animation by the human eye. (*Id.,* pp. 25-26, 49, 53, 55.)

Mr. Stuart attested that the hardware (IBM) and software (AutoCAD and 3-D Studio Max developed by Autodesk) used by 21st Century in preparing a visual exhibit are generally accepted in the field of computer science. (*Id.,* pp. 27-29.) If the Commonwealth's motion in limine is granted, 21st Century will produce an animated exhibit to demonstrate the opinions formulated by Dr. Ross and Trooper Beach concerning the manner in which Jennifer Serge was killed. To that end, the Commonwealth seeks to present a visual exhibit to illustrate that the defendant used a deadly weapon on a vital part of the human body.[1] The Commonwealth further intends to utilize the animated exhibit in an effort to refute the

1. The firing of a bullet in the general area in which a person's vital organs are located is sufficient to prove specific intent to kill beyond a reasonable doubt. *Commonwealth v. Padgett,* 465 Pa. 1, 5, 348 A.2d 87, 88 (1975); *Commonwealth v. Serge,* 102 Lacka. Jur. 715, 718-19 (2001).

defendant's self-defense claim by demonstrating its experts' theory that the victim was shot first in the back rather than the arm. (*Id.* at pp. 65-68.) Although the putative animation had not yet been prepared at the time of hearing, the Commonwealth did submit for review the videotape exhibit that was developed by 21st Century in *Commonwealth v. Scher,* no. 1996-CR-174 (Susq. Cty.), *rev'd,* 732 A.2d 1278 (Pa. Super. 1999), *app. granted,* 561 Pa. 693, 751 A.2d 189 (2000), as an exemplar of the exhibit to be created in this case.[2] (*Id.* at pp. 29-34.)

The Commonwealth submits that the methodology employed by 21st Century is generally accepted as reliable within the relevant scientific community such that it is admissible under *Frye v. U.S.,* 293 F. 1013 (D.C. Cir. 1923), as adopted in *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977) and its progeny. See *Blum v. Merrell Dow Pharmaceuticals Inc.,* 564 Pa. 3, 764 A.2d 1, 4 (2000) (originally granting allocatur to consider whether Pennsylvania should follow the scientific evidence standard articulated in *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), but later finding it "jurisprudentially unsound . . . to utilize this case as a vehicle to evaluate the wisdom of such a change" from *Frye* to *Daubert*). By order dated August 13, 2001, the Commonwealth was directed to produce the report of Trooper Beach and the supplemental report of Dr. Ross by no later than August

---

2. Regrettably, the trial court in *Scher* did not address the admissibility of 21st Century's exhibit as demonstrative evidence since it reportedly precluded the use of the videotape animation on the grounds that it was produced untimely by the Commonwealth well beyond the court-imposed deadline for the disclosure of trial exhibits. (*Id.* at pp. 31-32.)

20, 2001. In addition to timely submitting its expert reports, the Commonwealth filed still images of 21st Century's visual exhibit in this case on September 4, 2001, and thereafter produced an initial draft of the animation itself on September 10, 2001, and a revised version on September 14, 2001. Upon the filing of those materials, this matter became ripe for disposition.

## II. DISCUSSION

### (A) *Standard of Review*

Pursuant to Pa.R.E. 402, all relevant evidence is generally admissible while evidence that is not relevant is inadmissible. *Commonwealth v. A. W. Robl Transport,* 747 A.2d 400, 404 (Pa. Super. 2000), *app. denied,* 564 Pa. 701, 764 A.2d 1063 (2000). Evidence is deemed relevant under Pa.R.E. 401 if it "logically tends to prove or disprove a material fact, make such a fact more or less probable, or support a reasonable inference regarding a material fact's existence." *Commonwealth v. Weaver,* 768 A.2d 331, 332 (Pa. Super. 2001). See also, *Commonwealth v. Farmer,* 758 A.2d 173, 180 (Pa. Super. 2000) ("[e]vidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' "), *app. denied,* 565 Pa. 671, 771 A.2d 1279 (2001). "The question of whether evidence is relevant and, therefore, admissible is a determination that rests within the sound discretion of the trial court and will not be reversed on appeal absent a showing that the court clearly abused its

discretion." *Fisher v. North Hills Passavant Hospital,* 781 A.2d 1232, 1234 (Pa. Super. 2001).

Even if evidence is considered to be relevant, it may nonetheless be excluded under Pa.R.E. 403 "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Commonwealth v. Rouse,* 752 A.2d 1041, 1046 (Pa. Super. 2001) (quoting Pa.R.E. 403). However, as the Superior Court of Pennsylvania has observed, "since all Commonwealth evidence in a criminal case will be prejudicial to the defendant, exclusion of otherwise relevant evidence will only be necessary where the evidence is so prejudicial that it may inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Commonwealth v. Kitchen,* 730 A.2d 513, 519 (Pa. Super. 1999). Stated otherwise, "[e]vidence is prejudicial not where it merely hurts a party's case, but where it tends to fix a decision which has an improper basis in the minds of the jury." *Fisher, supra* at 1234.

Those principles which govern the admissibility of evidence generally likewise apply to the use of demonstrative evidence. See *Commonwealth v. Schroth,* 479 Pa. 485, 489, 388 A.2d 1034, 1036 (1978) (demonstrative evidence "may be admitted so long as it has relevance and can assist the jury's understanding of the facts of the case before it"). Thus, "demonstrative evidence is admissible if its probative value outweighs the likelihood of improperly influencing the jury." *Pascale v. Hechinger Co. of Pa.,* 426 Pa. Super. 426, 437, 627 A.2d 750, 755 (1993). The trial court is vested with consider-

able discretion in considering the admissibility of demonstrative evidence, *Commonwealth v. Lee,* 541 Pa. 260, 274, 662 A.2d 645, 652 (1995), and "it is not for an appellate court to usurp the function of the trial court to balance the alleged prejudicial effect of the evidence against its probative value." *Commonwealth v. O'Shea,* 523 Pa. 384, 400, 567 A.2d 1023,1030 (1989), *cert. denied sub nom., O'Shea v. Pennsylvania,* 498 US. 881 (1990). Accord *Commonwealth v. Crawley,* 514 Pa. 539, 526 A.2d 334 (1987) (mannequins, which were used to mark the location of fatal head injuries, were objectively utilized to assist an expert witness during his testimony and were therefore admissible in a murder prosecution).

## (B) *Computer-Generated Exhibits*

Since as early as *Perma Research and Dev. v. Singer Co.,* 542 F.2d 111, 115 (2nd Cir. 1976), *cert. denied,* 429 U.S. 987 (1976), courts have struggled with the admissibility of computer-generated exhibits (CGE's) either as demonstrative evidence to illustrate an expert's opinion or as the substantive basis for an expert witness' conclusion.[3] CGE's first gained prominence in civil proceed-

---

3. Visualizations and recreations which are produced by a computer have been identified as "computer-generated visual evidence," *Gosser v. Commonwealth,* 31 S.W.3d 897, 901 (Ken. 2000), computer-generated evidence, see Cerniglia, *Computer-Generated Evidence— Demonstrative, Substantive or Pedagogical,* 18 Am. J. Trial Advoc. 1, 4-5 (Summer 1994), and computer-generated exhibits. See Galves, *Where the Not-So-Wild Things Are: Computers in the Courtroom, the Federal Rules of Evidence, and the Need for Institutional Reform and More Judicial Acceptance,* 13 Harv. J.L. & Tech. 161, 165 n.2 (Winter 2000). Inasmuch as 21st Century denotes its graphical presentation in this case as an "animated exhibit" and "visual exhibit," we will refer to the technology at issue as computer-generated exhibits.

ings where they were "used in the courtroom by civil litigators for reconstructing accidents, including automobile and truck accidents, aircraft collisions, construction equipment accidents, and industrial accidents, as well as in patent litigation." *Pierce v. State,* 718 So.2d 806, 808 (Fla. App. 4th Dist. 1997). As computers became smaller and more efficient and animation software became more accessible, the cost of producing CGE's decreased and their use in the courtroom became more prevalent. See D'Angelo, *The Snoop Doggy Dogg Trial: A Look at How Computer Animation Will Impact Litigation in the Next Century,* 32 U. San. Fran. L. Rev. 561, 562-63 (Spring 1998); Kousoubris, *Computer Animation: Creativity in the Courtroom,* 14 Temp. Envtl. L. & Tech. J. 257, 258-59 (Fall 1995). Consequently, "[t]he use of computer-generated graphics and animation as evidence is a growing trend in the Commonwealth, as it is in courtrooms all across the land." *Gosser,* 31 S.W.3d at 901.

Computer animations are no longer confined to civil litigation and "[w]ith advancements in the field of crime scene reconstruction, the widespread use of video, and advances in computer technology, video reenactments and computer-aided crime scene reconstruction are making their way into the courtroom in the trial of criminal cases." *Harris v. State,* 13 P.3d 489, 493 (Okla. Crim. App. 2000), *cert. denied sub nom., Harris v. Oklahoma,* 121 S.Ct. 1971 (U.S. 2001). For example, CGEs have been admitted in prosecutions involving vehicular homicide, see *Pierce, supra,* criminally negligent child abuse, see *People v. Cauley,* 2001 WL 618578 (Colo. App. 2001) (video animation of shaken baby syndrome), and murder charges. See *People v. Hood,* 53 Cal. App.

4th 965, 62 Cal. Rptr.2d 137 (Cal. App. 4th Dist. 1997) (computer animation of shooting), *cert. denied sub nom., Hood v. California,* 522 U.S. 1093 (1998). Furthermore, CGEs are being employed in the courtroom both by the prosecution, see *Mintun v. State,* 966 P.2d 954 (Wyo. 1998), and the defense. See *People v. McHugh,* 124 Misc.2d 559, 476 N.Y.S.2d 721 (1984) (computer re-enactment of fatal car crash to demonstrate defendant's version of the accident). As one commentator has observed, "criminal trials are on the verge of a technological revolution that will allow lawyers to transform experts' dry, verbal testimony into dynamic, TV-like shows that can mentally transport jurors to crime scenes and play out for them an advocate's version of events." Hennes, *Manufacturing Evidence for Trial: The Prejudicial Implications of Videotaped Crime Scene Re-enactments,* 142 U. Pa. L. Rev. 2125, 2129 (June 1994). The advent of such computer technology in criminal trials has also created new evidentiary issues for the bench and bar.

## (C) *Pennsylvania Precedent*

No Pennsylvania appellate court has yet to address the use or admissibility of computer-generated animation to illustrate an expert witness' opinion in a criminal proceeding. More than a decade ago, the Supreme Court of Pennsylvania granted allocatur in *Commonwealth v. Klinghoffer,* 370 Pa. Super. 648, 533 A.2d 1075 (1987) (memorandum), *app. granted,* 518 Pa. 616, 541 A.2d 744 (1988), to consider the evidentiary foundation required for an expert in "vehicular dynamics" to offer an opinion that was generated solely by a computer program

known as "Apple Crash." However, a majority of the court later dismissed that appeal as having been improvidently granted, thereby producing a sharply worded dissent protesting that the appeal should have been heard since it "squarely present[ed] an issue of substantial importance in our increasingly computerized society, namely the scope of the evidentiary foundation which should be required prior to the admission of a computer-generated expert opinion on a critical issue." *Commonwealth v. Klinghoffer,* 522 Pa. 562, 563, 564 A.2d 1240, 1241 (1989) (Larsen, J., dissenting).

In *Commonwealth, Department of Environmental Resources v. Al Hamilton Contracting Co.,* 665 A.2d 849 (Pa. Commw. 1995), the Commonwealth Court considered an analogous issue involving the admissibility of a map containing contour lines and markings that had been drawn by a computer and which reportedly represented the location of acid mine drainage discharge areas. The Environmental Hearing Board had refused to permit the Department of Environmental Resources to introduce the map and held that it "was inadmissible under the *Frye* test since the department failed to establish that the method of producing the computer-generated structure contour lines was generally accepted within the relevant scientific field of hydrogeology." *Id.* at 852. On appeal, the department argued that the map was "not scientific evidence and therefore the test for its admissibility should be whether it accurately represents what it purports to represent." *Id.* Although the Commonwealth Court agreed with the department's proffered standard for admission, it nevertheless affirmed the EHB's ruling by concluding that the department had not satisfied its bur-

den of establishing that the exhibit accurately portrayed what it purported to depict. *Id.* at 852-53. Regrettably, the *Al Hamilton Contracting Co.* decision does not squarely address the use of computer-generated animations as demonstrative evidence to exemplify an expert opinion.

Since the time of the *Al Hamilton Contracting Co.* decision in 1995, the issue of computer-generated evidence has surfaced in only one reported Pennsylvania case, *Quigg v. Brown,* 28 D.&C.4th 104 (Phila. Cty. 1996), *aff'd memorandum,* 455 Pa. Super. 686, 687 A.2d 866 (1996), where a plaintiff introduced an animation that had been prepared by "21st Century Graphic Productions" to demonstrate an expert's opinion as to how an accident had allegedly occurred. Following a defense verdict, the plaintiff filed post-trial motions asserting that the trial court had not properly described the computer animation to the jury. *Id.* 28 D.&C.4th at 126. However, it was unnecessary for the *Quigg* court to analyze the admissibility of animated exhibits in Pennsylvania since the CGE question had been decided in favor of the plaintiff prior to trial and "[a]ny possible error in the manner of presentation of the computer animation or cartoon was to the detriment of the defense." *Id.* at 129.

In its legal brief, the Commonwealth relies upon *Commonwealth v. Impellizzeri,* 443 Pa. Super. 296, 661 A.2d 422 (1995), and *Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139 (2000), in support of its contention that the putative animation is admissible. In *Impellizzeri,* the defense investigator testified that the victim was too short to climb through the basement window from which she allegedly escaped after being sexually assaulted by the

defendant. During its rebuttal, "the prosecution presented a videotape showing a female of the same height and weight as the victim crawling out of [defendant's] basement." *Id.* at 307, 661 A.2d at 428. On appeal, the Superior Court upheld the admission of the videotape and found that it had been properly authenticated and was relevant to counter the defense version of events by demonstrating that "it was possible for someone of the victim's stature to escape from the basement window." *Id.* at 310, 661 A.2d at 428-29.

The *Impellizzeri* holding is not directly relevant to the animation issue at hand since it involved a videotape portraying live actors and "was not an actual depiction of the criminal episode . . . ." *Id.* at 309, 661 A.2d at 428. Similarly, the *Spotz* decision concerned the admissibility of videotape footage of the actual crime scene and the route traveled by the vehicles which were operated by the defendant and his accomplice during the kidnapping of the victim. See *Spotz, supra* at 520-22, 756 A.2d at 1151-52. Moreover, the sole case cited by the defendant in his opposing brief likewise involved the use of a videotape depicting live actors (police officers) re-enacting the crime. See *Lopez v. State,* 651 S.W.2d 413, 414-15 (Tex. App. 1983) ("the concept of recreating human events with the use of actors is a course of conduct that is fraught with danger" since "[t]he general appearance of an actor, his facial expression or slightest gesture whether intended or not may sway a juror who has listened to lengthy testimony.").

None of the case law cited by the parties deals with the use of an animated exhibit prepared by a computer. Although the *Al Hamilton Contracting Co.* decision ad-

dressed the issue of a static exhibit (*i.e.,* map) that included features which had been drafted by a computer program, it did not decide the larger issue regarding the use of computer-generated animations as demonstrative evidence. Nor did it consider the prejudicial impact that such animation may have upon a criminal jury since the appeal in that case involved a hearing before an administrative law judge regarding DER citations. Moreover, the *Klinghoffer* court declined the opportunity to establish a standard for the admission of a computer-generated simulation which served as the basis for an expert's conclusion. Thus, the usage of computer-generated animation in a criminal trial to assist an expert witness in presenting opinion testimony appears to be an issue of first impression in this Commonwealth.

### (D) *Demonstrative Animation vs. Substantive Simulation*

The great majority of those jurisdictions which have considered the admissibility of CGE's has recognized a salient distinction between a "simulation" and an "animation" that is produced by a computer. In a simulation, data is entered into a computer which is programmed to analyze the information and perform calculations by applying mathematical models, laws of physics and other scientific principles in order to draw conclusions and recreate an incident. See *Cauley, supra* at *4; *State v. Farner,* 2000 WL 872488, **8, 21 (Tenn. Crim. App. 2000). For instance, a computer simulation may compute the effects of acceleration, gravity, friction, atmospheric pressure or water flow in formulating a recreation of events. See Bennett et al., *Seeing is Believing; Or is*

*it? An Empirical Study of Computer Simulations as Evidence,* 34 Wake Forest L. Rev. 257, 260 (Summer 1999); Borelli, *The Computer as Advocate: An Approach to Computer-Generated Displays in the Courtroom,* 71 Ind. L. J. 439, 450-52 (1996). More importantly, the results of the computer simulation serve as the actual basis for the opinion(s) expressed by the reconstruction expert. See *Pierce,* 718 So.2d at 808. See also, Galves, 13 Harv. J. L. & Tech. at 185 (to produce a simulation, "an expert enters a compilation of mathematical formulae or other scientific principles into the computer so that the computer can generate a model—based on the data and scientific assumptions—that the expert will use to form an opinion as to what must have or could have actually happened").

In contrast, an animation does not develop any opinions or perform any scientific calculations and, to the contrary, is nothing more than a graphic depiction or illustration of the previously formed opinion of an expert. See *Cauley, supra* at *4. As one commentator has described:

"Animations are simply computer-generated drawings assembled frame by frame which, when viewed sequentially, produce the image of motion. The still frames are viewed in rapid succession, usually at a speed of 24 or 30 frames per second. The image is merely a graphic representation—a series of pictures 'drawn' by a computer operator with a computer—depicting a witness' testimony." Galves, *supra* at 180-81. Accord Joseph, *A Simplified Approach to Computer-Generated Evidence and Animations,* 43 N.Y. L. Sch. L. Rev. 875, 888 (2000) ("[a]t its simplest, an animation is merely a sequence of

illustrations that, when filmed, videotaped or computer-generated, create the illusion that the illustrated objects are in motion"). In short, a simulation uses computer programs to formulate certain conclusions and recreate an event whereas an animation simply illustrates an opinion or reconstruction which an expert witness has already devised through the expert's own independent computations and analyses. See *e.g., Farner, supra* at *21.

Although some courts have utilized the terms simulation, recreation, illustration and animation interchangeably, see *e.g., State v. Clark,* 101 Ohio App.3d 389, 416-17, 655 N.E.2d 795, 812-13 (1995), *app. dismissed,* 72 Ohio St.3d 1548, 650 N.E.2d 1367 (1995), most have recognized that the simulation-animation dichotomy should be the focal point of any evidentiary inquiry. See *Hinkle v. City of Clarksburg,* 81 F.3d 416, 425 (4th Cir. 1996). In aptly describing this fundamental distinction, a federal district court has noted:

"Although defendant argues that there is no practical difference between recreating an accident and recreating an expert's theory of the accident, the difference is both real and significant; it is the difference between a jury believing that they are seeing a repeat of the actual event and a jury understanding that they are seeing an illustration of someone else's *opinion* of what happened." *Datskow v. Teledyne Cont'l Motors,* 826 F. Supp. 677, 686 (W.D. N.Y. 1993). (emphasis in original)

As a consequence, an animation is generally regarded as demonstrative evidence that a jury should not be entitled to review during its deliberations while a simulation is considered to be substantive evidence in the same nature as any other scientific test or experiment. See

*Cauley, supra; Farner, supra* at \*\*21-24; *Gosser,* 31 S.W.3d at 901-902.

The classification of a CGE as a simulation or an animation also determines the evidentiary foundation which governs its admissibility. See Bardelli, *The Use of Computer Simulations in Criminal Prosecutions,* 40 Wayne L. Rev. 1357, 1360-63 (Spring 1994). Since a simulation is dependent upon scientific principles, its admissibility is controlled by *Frye/Daubert* standards which regulate scientific evidence. *Pierce,* 718 So.2d at 808. See also, Fulcher, *The Jury as Witness: Forensic Computer Animation Transports Jurors to the Scene of a Crime or Automobile Accident,* 22 U. Dayton L. Rev. 55, 65-68 (Fall 1996). Thus, the party seeking to offer a simulation must introduce evidence of the validity of the computer program's methodology and scientific principles as a condition precedent to its admission. *Clark v. Cantrell,* 339 S.C. 369, 382 n.2, 529 S.E.2d 528, 535 n.2 (2000). To satisfy that burden, the proponent of a computer-generated simulation must demonstrate that: "(1) the computer is functioning properly; (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); and (3) the program is generally accepted by the appropriate community of scientists." *Commercial Union Ins. Co. v. Boston Edison Co.,* 412 Mass. 545, 549, 591 N.E.2d 165,168 (1992) (simulation estimating energy usage based upon a computer program comprised of scientific formulae and algorithms concerning heat transfer, building materials, operating characteristics of heating equipment, and weather history); *Kudlaceck v. Fiat S.P.E.,* 244 Neb. 822, 842-43, 509

N.W.2d 603, 617 (1994). Accord *Clark,* 101 Ohio App.3d at 416, 655 N.E.2d at 812.

However, an animation does not draw conclusions and is merely a demonstrative exhibit, and as such, it is not subject to the *Frye/Daubert* test. See *Pierce,* 718 So.2d at 808 (reasoning that an animation is a new form of expression, not a scientific or experimental test, and is not governed by *Frye*); Galves, 13 Harv. J. L. & Tech. at 256-57 (observing that *Daubert* does not apply to animation used for demonstrative purposes to illustrate a witness' verbal testimony since "the jurors are not being asked to accept the science used to create the CGE."). Instead, computer animation is generally deemed admissible if it: (1) is properly authenticated under Rule 901 as a fair and accurate representation of the evidence it purports to portray; (2) is relevant under Rules 401 and 402; and (3) has a probative value that is not outweighed by the danger of unfair prejudice under Rule 403.[4] See *Harris,* 13 P.3d at 495; *Mintun,* 966 P.2d at 959. Accord, *Cleveland v. Bryant,* 236 Ga. App. 459, 460, 512 S.E.2d 360, 362 (1999) (animated videotape illustrating an

---

4. Some courts have characterized this evidentiary standard as a four-part test which requires the animation to (1) be authentic under Rule 901, (2) be relevant under Rules 401 and 402, (3) be a fair and accurate representation of the evidence to which it relates, and (4) have a probative value that outweighs the danger of unfair prejudice under Rule 403. See *e.g., Cauley, supra* at **5-6; *Cantrell,* 339 S.C. at 384, 529 S.E.3d at 536. Since the requirement that the evidence be a fair and accurate portrayal is actually a means by which an exhibit may be properly authenticated under Rule 901, see Galves, 13 Harv. J. L. & Tech. at 227-28 (if a CGE depicts its subject matter fairly and accurately, then it is properly authenticated under the "fair and accurate portrayal" test), we agree with those jurisdictions which have condensed the criteria, for admission into a tripartite test.

expert's opinion is admissible if it is a fair and accurate representation of the expert's opinion as to how the incident occurred). Furthermore, although the proponent of a demonstrative animation need not establish that the computer program is generally accepted in the field of computer science, compare *Commercial Union Ins. Co., supra,* if the animation purports to contain exact measurements or to be drawn to scale, the party seeking to utilize it must offer testimony as to how the data was obtained and inputted into the computer. *Gosser,* 31 S.W.3d at 903.

## (E) *Evidentiary Foundation Required for Computer-Generated Animation Under Pennsylvania Rules of Evidence*

Since a computer-generated animation is a graphic illustration of an expert's reconstruction rather than a simulation based upon scientific principles and computerized calculations, it is not subject to the *Frye/Topa/Blum* test governing the admissibility of scientific evidence in Pennsylvania. Our conclusion in this regard is consistent with the rationale of *Al Hamilton Contracting* which found *Frye* to be inapplicable to a demonstrative map containing computer-generated contour lines. Of course, the underlying expert opinion which the animation seeks to illustrate must satisfy Pa.R.E. 702 and be premised upon principles and methodology that are generally accepted in the relevant scientific community. See *North American Van Lines Inc. v. Emmons,* 50 S.W.3d 103,130 (Tex. App. 2001). Moreover, in accordance with Pa.R.E. 703, the facts or data on which the expert has relied in forming the opinion which is illustrated by the computer

animation must be "of a type reasonably relied upon by experts in the particular field." See *Pierce,* 718 So.2d at 809.

Accordingly, a computer-generated animation is admissible under Pennsylvania law to demonstrate the opinion of an expert witness provided that it is duly authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Pa.R.E. 901(a). Such a requirement of authentication is the same foundation which applies to the admission of any pictorial representation as demonstrative evidence. See *e.g., Commonwealth v. Rovinski,* 704 A.2d 1068,1074 (Pa. Super. 1997) ("[i]n order for a photograph to be admitted into evidence it must be properly authenticated by the testimony of a witness, with sufficient knowledge, that the photograph is a fair and accurate depiction of the relevant scene."), *app. denied,* 555 Pa. 707, 723 A.2d 1024 (1998). In addition, the proffered animation must be relevant under the Pennsylvania Rules of Evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. Finally, the probative value of the animation must not be "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Pa.R.E. 403.

The testimony and materials submitted by the parties clearly reflect that the CGE produced by 21st Century is a demonstrative animation rather than a substantive simulation. 21st Century has not composed a re-enactment which was devised independently by a computer program. On the contrary, it has created an "animated ex-

hibit" that will illustrate the opinions of the Commonwealth's experts in ballistics, forensic pathology and crime scene reconstruction as to how the Serge shooting allegedly occurred. In that respect, 21st Century's "visual exhibit" is tantamount to "a mechanized version of what a human animator does when he or she draws each frame of activity, based upon information supplied by experts, then fans through the frames, making the characters drawn appear to be moving." *Hood,* 53 Cal. App.4th at 969, 62 Cal. Rptr.2d at 140. The following passage from one of the first reported cases discussing the use of demonstrative CGE's best summarizes our interpretation of the Commonwealth's proposed animation in this case:

"The evidence sought to be introduced here is more akin to a chart or diagram than a scientific device. Whether a diagram is hand drawn or mechanically drawn by means of a computer is of no importance.

"While this appears to be the first time such a graphic computer presentation has been offered at a criminal trial, every new development is eligible for a first day in court.

"A computer is not a gimmick and the court should not be shy about its use, when proper. Computers are simply mechanical tools—receiving information and instructions at lightening speed. When the results are useful, they should be accepted, when confusing, they should be rejected. What is important is that the presentation be relevant to a possible defense, that it fairly and accurately reflect the oral testimony offered and that it be an aid to the jury's understanding of the issue." *McHugh,* 124 Misc.2d at 560, 476 N.Y.S.2d at 722-23.

Hence, the admissibility of 21st Century's CGE is not controlled by the *Frye/Topa/Blum* standard for scientific evidence.[5] Nevertheless, it must be still determined whether the Commonwealth's computer animation is admissible under Pa.RE. 401, 403 and 901.

## (1) Authentication Under Rule 901

To properly authenticate 21st Century's animation as a fair and accurate depiction of the crime scene reconstruction developed by the Commonwealth's experts, the Commonwealth must introduce evidence at the time of trial concerning the preparation of the animation and the collection of the information upon which it is predicated. See *Harris,* 13 P.3d at 495 ("[t]he authentication of a computer-enhanced video animation, or any other video animation for that matter, can be made by offering testi-

5. Even assuming arguendo that 21st Century's animation was governed by the "scientific evidence" rule, it is uncontroverted that the IBM hardware and Autodesk's AutoCAD software used to prepare the CGE in question are generally accepted in the field of computer science. (See T.P. 7/30/01, pp. 27-29.) Accord *People v. Rivera,* 182 Ill. App.3d 33, 42, 537 N.E.2d 924, 931,130 Ill. Dec. 595, 602 (1989) (concluding that the trial "judge correctly held that he could take judicial notice that IBM is a 'standard, reliable computer' "); *Pierce,* 718 So.2d at 807 (noting that the AutoCAD computer program is "established as accepted in the engineering field as one of the leading CAD (computer-aided design) programs in the world"); *Clark,* 101 Ohio App.3d at 417, 655 N.E.2d at 813 (holding that the field of crime scene reconstruction through the use of computer-assisted drafting such as AutoCAD software "has gained general acceptance, as evidenced by the numerous courts which have admitted computer simulations or reconstructions as evidence."). It should also be noted that "Autodesk is the largest provider of CAD software in the world" and that "[i]ts premier product, AutoCAD, has literally 80 percent of the CAD market." *Vermont Microsystems Inc. v. Autodesk Inc.,* 88 F.3d 142, 144 (2nd Cir. 1996).

mony from a witness familiar with the animation and the data on which it is based . . . ."); *Cantrell,* 339 S.C. at 386, 529 S.E.2d at 537 (finding that "the animation was authenticated by the testimony of the expert who prepared the underlying data and the computer technician who used that data to create it"). In particular, the Commonwealth must offer testimony from the law enforcement personnel who examined the crime scene, retrieved physical evidence and secured measurements which were utilized by the experts in recreating the shooting. The Commonwealth's experts in ballistics, crime scene reconstruction and forensic pathology whose opinions are illustrated by the animation must likewise testify before the CGE is displayed and their opinions must be based upon generally accepted principles. Those experts must also confirm that the animated exhibit is an accurate depiction of their opinions. See *Mintun,* 966 P.2d at 959; *Hood,* 53 Cal. App.4th at 968, 62 Cal. Rptr.2d at 139.

Furthermore, Pa.R.E. 901(b)(9) states that a "process or system" may be duly authenticated by "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Thus, while it is not necessary for the animator to separately satisfy the *Frye/Topa/Blum* test, [s]he must nevertheless explain at trial how the three dimensional drawings were produced via the AutoCAD software and thereafter transformed onto videotape to portray the illusion of motion. See *Pierce,* 718 So.2d at 807-808. See also, *D'Angelo,* 32 U. San. Fran. L. Rev. at 568.

If the Commonwealth introduces the requisite testimony from the police, experts and animator, the visual

exhibit prepared by 21st Century will be properly authenticated under Pa.R.E. 901. The fact that the proffered animation may be inconsistent with the defense version of events is not grounds for its exclusion provided that it accurately portrays the Commonwealth's account of the shooting. See *Cantrell,* 339 S.C. at 386, 529 S.E.2d at 537. However, if the CGE does not accurately reflect the testimony of the Commonwealth's experts, it will be precluded from evidence as violative of Pa.R.E. 901. See *Farner, supra,* at *24 (concluding that the computer visualization of the accident reconstruction had not been properly authenticated since the Commonwealth's expert "testified that he could not calculate the Camaro's speed because it left no yaw marks or skid marks at the scene."); *Sommervold v. Grevlos,* 518 N.W.2d 733, 738 (So. Dak. 1994) (animation properly excluded as an inaccurate reflection of the testimony inasmuch as it displayed the wrong location of the accident and assumed that the bicycles were traveling 25 miles per hour even though the evidence established the speed as being between 28-40 miles per hour).

### (2) Rule 401: Relevance

The computer animation prepared by 21st Century will demonstrate the Commonwealth's theory regarding the shooting and rebut the defendant's contention that he was attacked by his wife and shot her in self-defense. Therefore, it is clearly relevant as tending to establish a material fact in the case, *i.e.,* whether the defendant murdered his wife or acted in self-defense. See *Harris,* 13 P.3d at 492, ¶7 (CGE was relevant "to illustrate the state's theory and [its expert's] conclusion that the victim was asleep

and reclining while he was shot" and "to disprove a theory that [defendant] was being attacked or that he was driving while he fired the gun."); *Harvey,* 649 So.2d at 789 (animation "had strong probative value" as "providing a visual demonstration of the shooting as described by [the forensic pathologist]"). Compare *Macaluso v. Pleskin,* 329 N.J. Super. 346, 350-53, 747 A.2d 830, 832-35 (2000) (video animation of soft tissue injuries was testimonial in nature rather than a mere visual aid and "was not relevant to plaintiff's precise medical condition and included speculation regarding the possible consequences of hypothetical injuries"), *cert. denied,* 165 N.J. 138, 754 A.2d 1214 (2000).

### (3) Pa.R.E 403 Exclusion

Even though the Commonwealth's animated exhibit may be relevant, it should nonetheless be excluded under Pa.R.E. 403 if its probative value is outweighed by the danger of unfair prejudice or juror confusion. See *Fulcher,* 22 U. Dayton L. Rev. at 70 ("[p]erhaps the most formidable obstacle faced by the proponent of a computer recreation is the balancing process required by Rule 403 of the . . . Rules of Evidence"). Critical commentators contend that computers have achieved such an aura of infallibility that jurors will view them as the ultimate arbiter of truth and afford too much weight to CGE's while disregarding other crucial pieces of evidence. See *e.g.,* Kousoubris, 14 Temp. Envtl. L. & Tech. J. at 272 (computer animation "makes a stunning impression on the minds of jurors" and "if a picture can tell a thousand words, a 3-D animated presentation can tell over a million words."); Garcia, *Garbage In, Gospel Out: Crimi-*

*nal Discovery, Computer Reliability and the Constitu-tion,* 38 U.C.L.A. L. Rev. 1043, 1049 (1991). Some jurists believe that this danger "is particularly true given the popularity of real-life television shows, where jurors may have regularly seen crime scene re-enactments presented as true." *Harris,* 13 P.3d at 502 (Chapel, J., dissenting). Needless to say, the prospect of unfair prejudice is of even greater concern in a criminal proceeding where an individual's life or liberty may be at stake. See Hennes, 142 U. Pa. L. Rev. at 2180-81("[b]efore practitioners and courts rush headlong into the twenty-first century and usher the use of advanced computer and video technology into the hallowed halls of justice, they should take a moment to step back and reflect upon the impact of this technology on the rights of the criminal defendant.").

Recent studies have indicated that jurors do not afford undue weight to animated reconstructions. See *e.g.,* Bennett, 34 Wake Forest L. Rev. at 285 ("the extraordinary possibilities inherent in computer animations and computer simulations raised hopes—and fears—that juries would find computer-generated displays more persuasive or convincing than other forms of evidence. These hopes and fears seem to be unwarranted, at least within the context of the empirical results of this study"). As judges and jurors become more familiar with computer technology in the digital age, it is less likely that CGE's will cause unfair prejudice or confusion.[6] *Cantrell,* 339

---

6. It is difficult to conceive how a properly authenticated computer animation could be excluded based upon a "confusion of the issues" objection since such a demonstrative exhibit is designed to clarify—not compound—any potential confusion in an expert's opinion. See *Harris,* 13 P.3d at 496, ¶26 (finding that the probative value of a CGE

S.C. at 387, 529 S.E.2d at 538. An animated exhibit should not be regarded as unfairly prejudicial merely because it enables a party to demonstrate a point more effectively. We concur with the following analysis of Rule 403 in the context of CGE's:

"Simply because an attorney or witness is articulate, smart, credible, likable, or even passionate in her courtroom presentation, her argument or testimony need not be excluded on the Rule 403 ground that the jury might be 'overwhelmed' by her persuasive trial presentation skills or credible testimony. We recognize that good argumentation or persuasive testimony does not constitute unfair prejudice. Accordingly, a well-prepared CGE that helps an attorney or witness communicate persuasively— like good diction, a well-timed dramatic pause, an effective appeal to an appropriate metaphor, or any other oratory skill—should not be a basis for a Rule 403 unfair prejudice exclusion. Rule 403 was never intended to exclude the likes of Clarence Darrow simply because he was effective and persuasive in the courtroom. Therefore, just because a CGE helps a jury absorb, understand, and believe attorney argument or witness testimony does not mean that Rule 403 has been violated." Galves, 13 Harv. J. L. & Tech. at 224.

Nevertheless, the animation must not be produced or presented in a manner that will arouse the jurors' sense

---

was not outweighed by any Rule 403 dangers since "[t]hese [computer-generated] tapes cleared up the confusion and made the expert's testimony easier to understand"). Accord Galves, 13 Harv. J. L. & Tech. at 225 (describing a Rule 403 argument as "a curious objection because an animation is made precisely because the proponent is trying to clarify complicated facts, not obscure them").

of horror, appeal to their sympathies or otherwise cause them to decide the case on an improper basis. As a result, the CGE must be "clinical and emotionless," *Hood,* 53 Cal. App.4th at 971-72, 62 Cal. Rptr.2d at 141, and should not display any blood or facial expressions or attempt to replicate the sound of gunshots or other noise. See *e.g., Pierce,* 718 So.2d at 810 (visual exhibit held not to be unfairly prejudicial since "[a]lthough evidence in this case indicated a bloody scene with screaming victims, the computer animation videotape demonstrated no blood and . . . the mannequins used in the computer animation videotape depicted no facial expressions"). Nor should the animation invite hearsay objections by including extra-judicial commentary such as a pre-recorded narration. See Joseph, 43 N.Y. L. Sch. L. Rev. at 890-91.

More importantly, in order to ensure that the jury does not confuse art with reality, an appropriate cautionary or limiting instructions should be provided pursuant to Pa.R.E. 105.[7] The jury should be advised that the animation is a demonstrative exhibit, not substantive evidence,

---

7. The court should further mitigate any potential prejudice by requiring the proponent of the CGE to provide the animated exhibit to the opposing party at the earliest practicable date so that the other party will be able to adequately investigate the manner in which the animation was prepared in the event it is necessary to challenge its admissibility. See Joseph, 43 N.Y. L. Sch. L. Rev. at 892 ("[t]o avoid unfair prejudice, pretrial discovery of computerized evidence, including the underlying computer program, is essential"); Kousoubris, 14 Temp. Envtl. L. & Tech. J. at 274 (advocating early pretrial disclosure so that "the opponent to the animation has adequate information to effectively cross-examine"). In a criminal proceeding, it is incumbent upon the court to improvise pretrial discovery of CGE's to safeguard the constitutional rights of defendants. Bardelli, 40 Wayne L. Rev. at 1375. Instantly, defense counsel has already been afforded the opportunity to cross-examine the animator during the evidentiary hearing regarding the means by which the animated exhibit has been prepared

which is being offered solely as an illustration of the proponent's version of events. *Hinkle,* 81 F.3d at 425; Fulcher, 22 U. Dayton L. Rev. at 75. The jury should further be admonished that it should not view the animation as an actual recreation of the incident and, like all evidence, may accept it or reject it in whole or in part. *Harris,* 13 P.3d at ¶13, 17; *Hinkle, supra.* Additionally, the jury should be reminded that "[a]n animation is only as good as the underlying testimony, physical data, and engineering assumptions that drive its images" and that "[t]he computer maxim 'garbage in, garbage out' applies to computer animations." *Cantrell,* 339 S.C. at 383-84, 529 S.E.2d at 536. Finally, the jurors should be cautioned that while the animation may be considered for demonstrative purposes, the prosecution must still meet its burden of proving all of the elements of the offense beyond a reasonable doubt. *Cauley, supra* at \*6. Such limiting instructions should be provided to the jury at the time of the initial presentation of the CGE *and* during the court's concluding charge. *Harris, supra* at ¶¶13, n.7.

Based upon our in camera review of 21st Century's animated exhibit, we do not find that its probative value is outweighed by the danger of unfair prejudice or confusion of issues. The animation does not depict any blood, facial expressions or inflammatory characteristics that could improperly influence the jury or "divert the jury's attention away from its duty of weighing the evidence impartially." See comment (1998) to Pa.R.E. 403. Provided that the jury is furnished with a carefully crafted

and produced. To ameliorate prospective prejudice, the Commonwealth will also be required to provide defense counsel with a copy of the final version of the videotaped animation at least 30 days prior to the start of this trial on November 12, 2001.

cautionary instruction addressing the concerns discussed above, the Commonwealth will be entitled to present the computer-generated animation to the jury once it has been properly authenticated. See Buckwalter, *A View From the Bench: Trial Techniques in the New Millenium,* 19 Temp. Envtl. L. & Tech. J. 1, 9 (Fall 2000) ("[p]ersonally, I happen to think that if it is properly authenticated, an appropriate foundation is laid for its use, and some cautionary instructions are given by the court, then [computer animation] is a fantastic way to explain your theory in an interesting manner"). Of course, the court will review 21st Century's final product prior to trial and if the videotape animation is revised to include inflammatory features subsequent to the date of this opinion, it will be excluded under Pa.R.E. 403.

## (F) *Conclusion*

As the public becomes more computer sophisticated, courts should become less technophobic and more willing to embrace technological advances so as to better reflect changes in society. See Fulcher, 22 U. Dayton L. Rev. at 76. "Just as the telegraph gave way to the telephone, the stagecoach gave way to the automobile, and the typewriter gave way to the word processor, so too will courtroom chalkboards, easels and blow-up placard charts give way to computer-generated exhibits." Galves, 13 Harv. J. L. & Tech. at 300. In fact, some jurisdictions have amended their rules of civil procedure to facilitate the use of CGE's in the courtroom. See *e.g.,* Md. Rules 2-504.3. A computer-generated animation should be treated the same as any other demonstrative exhibit or graphic representation and should be admissible if it satisfies the requirements of Pa.R.E. 401, 403 and 901.

Consequently, the Commonwealth's motion in limine will be granted subject to the conditions set forth in this opinion.

## ORDER

And now, September 14, 2001, upon consideration of the Commonwealth's "motion in limine: crime re-enactment," the defendant's response thereto, the testimony and exhibits submitted by the parties and the oral argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) The Commonwealth's motion in limine is granted subject to the conditions set forth in the foregoing memorandum and the requirements of Pa.R.E. 401, 403 and 901; and

(2) At least 30 days prior to the commencement of trial on November 12, 2001, the Commonwealth shall provide the defendant with a copy of the final version of the computer-generated animation produced by 21st Century Forensic Animations.